**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AJ MARKETING, LLC<br><br>Plaintiff,<br><br>v.<br><br>JUUL LABS, INC.<br><br>Defendant. | CIVIL ACTION NO. _____________<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff AJ Marketing, LLC ("AJ Marketing" or "Plaintiff") brings this Complaint for Patent Infringement against Defendant Juul Labs, Inc. ("Juul" or "Defendant") and alleges as follows:

## I. NATURE OF THE ACTION

1. This is an action for patent infringement arising under the Patent Act, 35 U.S.C. § 100 et seq. AJ Marketing is the sole owner and assignee of United States Patent No. 8,851,068 B2 (the "'068 Patent"), entitled "Personal Inhalation Devices."

2. The '068 Patent describes the architecture of the modern programmable electronic cigarette. It was the first patent to integrate three foundational innovations into a single personal inhalation device: (a) programmable metering control electronics that regulate the deliverable discharged with the vapor; (b) pin-based and cartridge-based input devices that allow programming of the control electronics through removable components with resistive circuits; and (c) a light-pipe indicator assembly that communicates system status to the user.

3. Juul has infringed and continues to infringe one or more claims of the '068 Patent through its design, manufacture, importation, sale, and offer for sale of personal vaporizer devices, including but not limited to the Juul Device (the "Juul 1"), and through its own assembly,

use, testing, and demonstration of complete Juul 1 devices within the United States. Juul has further infringed through its design, manufacture, use, and importation of the Juul2 Device—a platform developed and deployed by Defendant and used by Defendant's employees and agents within the United States, including in connection with Defendant's design, testing, demonstration, and regulatory activities. The Juul 1 and Juul2 Devices are collectively referred to herein as the "Accused Products" or the "Juul Devices." Each Accused Product practices each element of at least independent Claim 1 of the '068 Patent.

4. As reflected in the United States Patent and Trademark Office's ("USPTO") records, the '068 Patent has been cited as prior art in over 350 subsequent patent applications. *See* USPTO Patent Center, U.S. Patent No. 8,851,068 B2, "Referenced By" (listing forward citations). Industry leaders including Altria, R.J. Reynolds, Philip Morris International, British American Tobacco, PAX Labs, and Juul itself have cited the '068 Patent or its published application in their own patent filings. *See, e.g.*, U.S. Patent No. 10,117,465 B2 (listing US 2011/0036346 A1 (Cohen et al.) and US 8,851,068 B2 (Cohen et al.) in References Cited); U.S. Patent No. 10,117,466 B2 (same); U.S. Patent No. 10,045,567 B2 (same).

5. AJ Marketing seeks compensatory damages adequate to compensate it for Juul's infringement, together with enhanced damages for willful infringement, attorneys' fees, costs, and such other relief as the Court deems just and proper.

## II. THE PARTIES

6. Plaintiff AJ Marketing, LLC is a South Dakota limited liability company with its principal office located at 110 Marginal Way PMB804, Portland, ME 04101.

7. AJ Marketing is the sole owner and assignee of the '068 Patent. All rights, title, and interest in the '068 Patent belong to AJ Marketing, including the right to sue for and collect past, present, and future damages for infringement.

8. On information and belief, Defendant Juul Labs, Inc. is a Delaware corporation with its principal place of business at 1000 F Street NW, Washington, DC 20004.

9. On information and belief, Juul designs, develops, manufactures, imports, markets, distributes, offers for sale, and sells personal vaporizer devices and associated cartridges and accessories throughout the United States, including in this judicial district.

10. On information and belief, Juul markets and sells its products through its website (www.juul.com), through authorized retail distributors, and through direct-to-consumer channels, including to customers located in the State of Delaware.

## III. JURISDICTION AND VENUE

11. This action arises under the Patent Act, 35 U.S.C. § 100 et seq. This Court has original subject matter jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12. This Court has personal jurisdiction over Juul. On information and belief, Juul is incorporated in the State of Delaware. Juul has purposefully availed itself of the privileges and protections of Delaware law by incorporating in this State. On information and belief, Juul transacts business in this District, has committed acts of infringement in this District, and has established minimum contacts with this forum such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1400(b). Defendant is incorporated in the State of Delaware and therefore resides in this District. Defendant has also committed infringing acts within this District.

## IV. THE INVENTORS AND THE PATENT IN SUIT

### A. The Inventors

14. The '068 Patent was invented by Scott A. Cohen and Dr. Michael J. Bedecs.

15. In 2006, Scott A. Cohen, an inventor, businessman, and consultant, was asked to consider whether a device could deliver metered doses of caffeine via vaporization to military aviators as a safer alternative to amphetamines for maintaining alertness during long missions. The problem was specific: aviators flying missions from European bases to Iraq and Afghanistan were taking amphetamines to stay awake, which, while effective, could impair their judgment, which could then potentially contribute mistakenly to friendly-fire incidents.

16. Cohen began to research the feasibility of a vaporization device that could deliver controlled, metered levels of caffeine and Vitamin B-12 as a stimulant alternative. His research identified vaporization as a promising delivery mechanism, and he concluded that nebulized caffeine could enter a user's system within approximately fifteen minutes of inhalation. Through subsequent contact with the e-cigarette industry—including working with a company called Smokeless Delite to load cartridges with caffeine, B-12, and flavoring agents—Cohen and his collaborators conducted informal studies to determine whether users could be stepped down from the stimulation of nicotine to caffeine. Those studies revealed that controlling the concentration of the deliverable alone was insufficient. To achieve consistent, individualized dosing, the device itself needed to meter the quantity

delivered per puff, limit the number of activations over time, and allow those parameters to be adjusted based on the user's goals and physiology. That insight—that programmable metering in the device was as essential as concentration in the deliverable—became the core of the invention.

17. Cohen's longtime business associate, Dr. Michael J. Bedecs, is an osteopathic physician. His clinical experience with nicotine addiction and the health consequences of smoking had led him to an independent interest in smoking cessation therapies. When Cohen and Bedecs joined forces to develop the invention, they recognized that the metered-dose vaporization concept, combined with nicotine, could be a powerful tool for helping users reduce their nicotine intake in controlled, programmable increments. The smoking cessation application reinforced the core technical requirement: the device had to meter and control the deliverable, not merely vaporize it.

18. Their research and collaboration led to the creation of the '068 Patent.

**B. The Patent**

19. Cohen and Bedecs founded AJ Marketing, LLC on April 13, 2009. The utility patent application was filed on August 26, 2010, and assigned U.S. Patent Application No. 12/869,000. The application claims priority to April 21, 2009, based on related design patent filings (U.S. Design Patent Application Nos. 29/335,784, 29/335,785, and 29/335,786).

20. On October 7, 2014, the USPTO issued U.S. Patent No. 8,851,068 B2, entitled "Personal Inhalation Devices." A true and correct copy of the '068 Patent is attached hereto as Exhibit A and incorporated by reference herein.

21. The ‘068 Patent was issued to Scott A. Cohen of Portland, Maine, and Michael J. Bedecs of Jupiter, Florida, and assigned to AJ Marketing, LLC. AJ Marketing is the sole owner of the ‘068 Patent.

22. Due to extensive examination by the USPTO, the ‘068 Patent received a 646-day Patent Term Adjustment (“PTA”) under 35 U.S.C. § 154(b). This adjustment extended the term of the ‘068 Patent accordingly.

23. The inventors exited the e-cigarette industry shortly after the ‘068 Patent was issued due to regulatory concerns and a reluctance to sell addictive products. Neither inventor had any connection to the e-cigarette industry for years thereafter. Cohen relocated multiple times—from Maine to Ohio to Arizona, back to Maine, and again to Arizona. Dr. Bedecs transitioned to age management medicine. Neither inventor had any awareness of Defendant’s existence or market dominance, or any reason to believe the technologies described in the ‘068 Patent had become commercially viable.

24. Prior to exiting the industry, the inventors made affirmative efforts to engage the industry with the ‘068 Patent and were rebuffed. In approximately 2010, Kyle Winther—owner of an e-cigarette retail business and a named co-inventor on the three original design patent applications (Ser. Nos. 29/335,784, 29/335,785, and 29/335,786, filed April 21, 2009, April 21, 2009, and April 22, 2009, respectively)—was approached about collaborating on the utility patent. Winther declined to participate as a co-inventor. In approximately 2014, after the ‘068 Patent issued, Cohen approached Craig Weiss, then CEO of NJOY—one of the leading e-cigarette companies in the United States at the time—about the patent. Weiss demonstrated no interest. AJ Marketing also maintained a publicly accessible website at personalinhalationdevices.com, published in or about 2014 and remaining accessible

through approximately 2018, which listed the ‘068 Patent by name, described the ‘068 Patent and expressly solicited strategic partners and licensees. No industry participant responded.

25. In June 2023, Cohen began researching the possibility of donating the patent to organizations dedicated to smoking cessation. In July 2023, Cohen contacted smoking cessation and public health organizations—including Truth Initiative, Campaign for Tobacco-Free Kids, and EndVaping.org—seeking to donate the ‘068 Patent for a charitable tax deduction. One such organization informed AJ Marketing that the sought-after donation value was significantly below the patent's probable commercial value. It was at that point that AJ Marketing began examining infringement claims and discovered that the Accused Products bore a striking resemblance to the patented invention.

26. The ‘068 Patent is valid and enforceable.

**C. The State of the Art Before the ‘068 Patent**

27. Before the ‘068 Patent, electronic cigarettes were "dumb" devices. The prior art, exemplified by Hon Lik's electronic atomization cigarette patents (EP1736065A1, filed March 18, 2005; EP1618803B1, filed March 8, 2004), consisted of three basic components: (a) a shell with a mouthpiece; (b) a nicotine solution reservoir that, when heated, would be vaporized into an aerosol; and (c) a reed switch or sensor that would complete an electronic circuit when the user inhaled, causing the solution to be heated.

28. The prior-art devices did not have any means of controlling or limiting the amount of nicotine delivered to the user. The quantity of deliverable was determined entirely by how hard, how frequently, and how long the user drew on the device. As Hon Lik's patent described, the sensor used "a linear signal output, which is proportional to the suction force

(i.e., the stronger one sucks, the longer the time of operation is).” EP1736065A1 at ¶ 24. That is monitoring, not metering. None of the prior-art references described the ‘068 Patent’s programmable system where the user or manufacturer can set maximum dosage per puff, maximum doses per time period, minimum intervals between activations, and cumulative on-time limits—all adjustable through interchangeable input devices. The degree and programmability of the control is where the ‘068 Patent’s real innovation lies.

29. The prior-art devices were also non-programmable in the sense that no removable component could define or change the device’s operating parameters upon insertion. There was no concept of a “pin” or interchangeable cartridge that would reprogram how the device operated. If a person “overdrew” on the device—meaning they inhaled either too frequently or with too great a draw—it could cause the device to overheat and/or draw too much nicotine solution. Consequently, reports of severe overheating of electronic cigarettes were relatively common. *See* Susan Rudy and Elizabeth Durmowicz, *Electronic Nicotine Delivery Systems: Overheating, Fires and Explosions*, 26 Tobacco Control 10, 10–18 (2017).

30. The prior-art devices used simple direct-illumination LEDs—a light emitting diode placed at the front end of the shell that was directly powered on when the circuit was activated. Hon Lik’s patents described “a LED and a cell are provided at the front end within the shell.” EP1736065A1 at ¶ 8. Similarly, Han et al. (US20090095311A1) described LEDs that simply emit light when electrified. No prior electronic cigarette used a light-pipe architecture in which light generated at a base is transmitted internally through translucent material rather than simply shining an LED directly at the tip or edge of a device. The ‘068 Patent’s approach—transmitting light through a translucent base member into a translucent

lens member that illuminates at its outer surface—is a fundamentally different engineering approach that was not practiced or described by any prior electronic cigarette inventor. Light-pipe technology, while known in other fields (such as barcode scanner illumination systems), had never been applied to the indicator light of an electronic inhalation device, despite the technology being available, evidencing the non-obviousness of the combination.

31. Regulatory agencies had expressed growing concern about the uncontrolled and inconsistent amounts of nicotine delivered by prior-art devices. Some jurisdictions placed limits on, or banned entirely, the use of electronic cigarettes. The '068 Patent was designed, in part, to address these regulatory concerns by providing a personal inhalation device "that is more likely to gain regulatory approval" through controlled and consistent delivery of deliverables. '068 Patent at col. 1, ll. 59–60.

**D. The '068 Patent's Innovation: Programmable Metering Architecture**

32. The '068 Patent solved the problems of prior-art electronic cigarettes through an integrated architecture comprising three innovation layers, all combined in a single personal inhalation device.

33. The '068 Patent introduced control electronics comprising a logic circuit, memory, clock, and associated circuitry that regulate the deliverable discharged with the vapor. '068 Patent at col. 6, ll. 40–48; FIG. 9. The patent describes multiple approaches to metering, including: (a) controlling the on-time of the atomizing device to meter the maximum dosage delivered by a single puff (col. 8, ll. 34–54); (b) metering the maximum dosage based on temperature rather than time (col. 8, ll. 55–67); (c) controlling a minimum time interval between activations (col. 9, ll. 1–15); (d) controlling the maximum number of activations permitted

during a set period of time (col. 9, ll. 16–36); and (e) tracking cumulative on-time and turning off the device when a predetermined value is reached (col. 9, ll. 37–49).

34. Adding to the innovation, the metering is programmable. The user can reprogram the control electronics to change the maximum dosage and/or the maximum number of doses per time period. ‘068 Patent at col. 9, ll. 49–55.

35. The ‘068 Patent introduced multiple means of programming the control electronics. The patent describes “a pin inserted into a receptacle formed in the inhalation device,” with “each pin having a means (such as a resistive circuit or mechanical features similar to the teeth on a key) defining unique programming instructions.” ‘068 Patent at col. 6, ll. 65–67; col. 7, ll. 1–9.

36. The patent also describes programming through a pressure transducer that can be triggered “by sequentially inhaling and/or exhaling through the orifice in various patterns or combinations,” or “by sequentially tapping the inhalation device against a surface (or tapping on the inhalation device), whereby each tap would cause the reed switch to close.” ‘068 Patent at col. 7, ll. 19–29.

37. Additionally, the patent describes programming through interchangeable cartridges: “Multiple interchangeable cartridges are provided, and each cartridge has an input device, such as a memory chip or logic circuit containing particular programming instructions, mounted therein. Different cartridges would provide different programming instructions. The cartridge input device makes an electrical connection with the logic circuit when its cartridge is connected to the atomizing unit.” ‘068 Patent at col. 8, ll. 7–19.

38. The ‘068 Patent introduced a multi-part indicator light assembly that communicates system status through a light-pipe architecture—a specific optical engineering approach in which

light generated at one location is transmitted internally through translucent material to be made visible at a different location, rather than simply shining an LED directly at the tip or edge of a device. As described in the specification, "the translucent base member 52 functions as a light pipe and transmits the light to the lens member 54." '068 Patent at col. 4, ll. 47–49. Critically, the light exits through the outer cylindrical surface of the lens member—the side of the device—not through the tip. The tip member (element 56) is made of opaque material, which blocks light from exiting the end of the device. This was a deliberate engineering choice so that the device would not resemble a glowing cigarette tip. A person of ordinary skill in the art of electronic device design would recognize the described structure as a socketed light-pipe assembly, not a bare LED. '068 Patent at col. 3, ll. 57–67; col. 4, ll. 1–53; FIGS. 3, 5–7.

39. When the light source is activated, "the translucent base member functions as a light pipe and transmits the light to the lens member. The light is then transmitted through the translucent lens member, causing the outer cylindrical surface of the body portion (which is visible to the user while inhaling on the inhalation device) to be illuminated." '068 Patent at col. 4, ll. 47–52.

40. The indicator light assembly does more than signal user inhalation. It communicates a range of device states and operational parameters. The specification describes the indicator light signaling device operation during puffing, power remaining status, the type of deliverable being used (different colors for different deliverables), and various operating modes including a "party mode in which the indicator light illuminates in different patterns, such as blinking or static." '068 Patent at col. 10, ll. 1–17, 55–63. Dependent claims 3, 6, and 7 further cover a bi-directional LED (Claim 3), display output (Claim 6), and audio

output (Claim 7)—all reflecting that the indicator assembly is an active, programmable communication interface, not merely a breath-activation lamp.

41. No prior-art reference or combination of references disclosed programmable metering electronics, pin-based or cartridge-based programming, a light-pipe indicator assembly, and a pressure transducer responsive to tapping sequences—all in a single personal inhalation device. The '068 Patent's contribution is not any single element in isolation; it is the integrated system. The programmable metering controls the deliverable; the pin-based programming allows the metering to be adjusted through interchangeable components; and the light-pipe indicator communicates the system's status back to the user. Each layer reinforces the others, creating a smart, regulated personal inhalation device that solved the problems of overheating, inconsistent delivery, and uncontrolled nicotine dosing that plagued the prior art. The entire modern e-cigarette industry was built on the architecture the '068 Patent first described.

**E. Industry Recognition of the '068 Patent**

42. The '068 Patent has been cited as prior art in over 350 subsequent patent applications, as reflected in the USPTO's Patent Center records for the patent. Forward citations span Altria, Juul, R.J. Reynolds, Philip Morris International, British American Tobacco, PAX Labs, and numerous medical-device startups—across nicotine, cannabinoid, aromatherapy, and metered pulmonary drug-delivery fields.

43. On information and belief, the '068 Patent has been identified as prior art in proceedings before the United States International Trade Commission involving electronic vaporization devices, including *In re Certain Vaporizer Devices, Cartridges Used Therewith, and Components Thereof*, ITC Investigation No. 337-TA-1368. In that proceeding, respondents

NJOY, Altria Group, and Altria Client Services LLC identified the '068 Patent (US 8,851,068 B2) in their Notice of Prior Art as a reference on which they expressly reserved the right to rely to establish invalidity of the asserted patents.

44. On information and belief, in a related ITC proceeding, industry participants used the '068 Patent as prior art to challenge the validity of subsequent e-cigarette patents. *See In re Certain Tobacco Heating Articles and Components Thereof*, ITC Investigation No. 337-TA-1199. In that proceeding, Altria Client Services LLC and Philip Morris Products S.A. submitted detailed invalidity contentions relying on the Cohen published application (US 2011/0036346 A1) as Exhibit A2—a primary prior art reference cited 77 times across their claim-by-claim analysis of U.S. Patent No. 9,839,238.

45. In inter partes review ("IPR") proceedings concerning U.S. Patent No. 9,839,238—an e-cigarette patent owned by RAI Strategic Holdings (R.J. Reynolds)—Philip Morris Products S.A. and Altria Client Services LLC relied on the Cohen patent (the '068 Patent's published application, US 2011/0036346) as a primary basis for challenging the validity of claims 19–21, devoting an entire ground of unpatentability to the argument that Cohen alone or in combination rendered the challenged claims obvious. The Patent Trial and Appeal Board found the Cohen-based invalidity arguments had "relatively strong" merit but denied institution solely on discretionary grounds under *Apple Inc. v. Fintiv, Inc.* due to a parallel ITC investigation involving the same parties and prior art—not because the Cohen arguments lacked merit. *See In re Inter Partes Review of U.S. Patent No. 9,839,238*, IPR2020-01097, Paper 9, Decision Denying Institution of Inter Partes Review at 9–11 (P.T.A.B. Jan. 19, 2021).

## V. THE ACCUSED PRODUCTS

### A. Overview

46. Since at least 2015, Juul has been designing, manufacturing, importing, advertising, and selling personal vaporizer devices. The Accused Products include: (a) the Juul Device (the "Juul 1"), which Defendant has designed, manufactured, imported, marketed, sold, and offered for sale in the United States; and (b) the Juul2 Device, which Defendant has designed, manufactured, and used in the United States in connection with its product development, testing, demonstration, and regulatory activities, and which Defendant has imported into the United States.

47. Each generation of the Juul Device practices each element of at least independent Claim 1 of the '068 Patent. The infringement is not limited to any single model; the foundational architecture described in the '068 Patent is common to all Juul Devices.

48. Plaintiff's preliminary, non-limiting element-by-element infringement analysis for the Accused Products is set forth in the claim chart attached hereto as Exhibit B and incorporated by reference as though fully set forth herein. Exhibit B is based on physical teardowns, publicly available information, Defendant's own patent literature, and Defendant's public marketing materials, and was prepared without the benefit of discovery. It is preliminary and non-limiting, and Plaintiff reserves the right to supplement or amend it, including as to additional claims and additional products.

### B. Structure and Operation of the Juul Devices

49. The Juul Devices are closed-system personal vaporizers. Each Juul Device comprises two principal components: (a) a device body containing a battery, an electronic circuit board with control electronics, a pressure sensor, and an LED indicator light; and (b) a removable

pod cartridge (a "JUULpod") containing a proprietary nicotine liquid, an atomizer, a wick, and electrical contacts at its base.

50. Each Juul Device body is comprised of "an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light and a pressure sensor." Prochaska et al., *Nicotine Delivery and Cigarette Equivalents from Vaping a JUULpod*, 31 Tob. Control e88–e93 (2022); *see also* Omaiye et al., *Design Features and Elemental/Metal Analysis of the Atomizers in Pod-Style Electronic Cigarettes*, 16(3) PLOS One (Mar. 9, 2021).

51. JUULpods are disposable cartridges filled with a proprietary liquid that includes nicotine salts. "JUUL Labs reports each 5% (nicotine-by-weight) cartridge contains approximately 40 mg nicotine per pod and is 'approximately equivalent to about 1 pack of cigarettes.'" Prochaska et al., *supra*.

52. To operate a Juul Device, a user inserts a JUULpod into the device body and puffs on the mouthpiece orifice. "The atomizer selectively generates an aerosol of the liquid in response to suction pressure at the aerosol outlet." U.S. RE Patent No. 49,114 at Abstract.

53. The Juul Devices incorporate temperature regulation. They are "specifically designed to operate at temperatures below 300°C." Juul Labs, Our Technology, juullabs.com/about/company/our-technology.

**C. The Juul 1 Device**

54. The Juul 1 Device (model numbers including JU288U8W and J6WDRF85) was Juul's original personal vaporizer, first sold in or around 2015. The Juul 1 is an aluminum-housed device approximately 3.5 inches in length.

55. Physical teardowns of the Juul 1, including exemplar model JU288U8W, confirm the following internal components: (a) an aluminum outer shell; (b) a rechargeable lithium-

polymer battery; (c) a printed circuit board carrying a microcontroller, associated integrated circuits, a pressure sensor, and an LED; (d) a flex circuit connecting the circuit board to charging contacts and pod-interface contacts; and (e) an internal plastic housing frame that carries the indicator light assembly. *See* Ex. B, Claim 1[a], [c], [e.1]–[e.7] (depicting the outer shell, circuit board and indicator light assembly).

56. The Juul 1's circuit board carries multiple integrated circuit chips, passive components, the pressure sensor (visible as a circular metallic component), and the LED (visible as a square component with a translucent diffusing surface).

57. The Juul 1's internal plastic housing frame includes a circular opening aligned with the LED port on the outer shell.

58. Imaging of the Juul 1 circuit board assembly shows the circuit board carrying the device's control electronics. *See* Ex. B, Claim 1[c].

59. Imaging of the JUULpod confirms the pod's internal structure, including the vaping-fluid reservoir and the atomizer assembly seated at the base of the pod. *See* Ex. B, Claim 1[a].

60. From its launch in 2015 through at least 2019, Defendant sold the Juul 1 as a bundled "Starter Kit" containing the device body, a JUULpod cartridge, and a USB charging dock—packaging the complete claimed system as a single retail product and providing written instructions directing its assembly and use. The Starter Kit was sold through Defendant's website and authorized retail channels throughout the United States. During the period in which the Starter Kit was sold, Defendant was directly conditioning consumers' access to the complete infringing system upon purchase of a product Defendant designed, assembled, and instructed. The Starter Kit is direct evidence that Defendant knew the device body and JUULpod together constituted the complete product and affirmatively

directed consumers to assemble and operate that combination. The Starter Kit is pleaded as evidence of Defendant's design, knowledge, and intent with respect to the unitary Juul 1 system, including in support of the induced and contributory infringement allegations in Count I below.

**D. The Juul2 Device**

61. The Juul2 Device represents Defendant's latest generation platform. On information and belief, the Juul2 has been designed and manufactured by Defendant and used by Defendant's employees and agents within the United States in connection with product development, testing, demonstration, and regulatory activities. Those activities include, on information and belief, the assembly and operation of complete Juul2 devices—device bodies with pods inserted—in connection with engineering verification, quality assurance, demonstrations, and Defendant's Premarket Tobacco Product Application ("PMTA") submissions to the U.S. Food and Drug Administration, which require testing of assembled, operating devices. On information and belief, the Juul2 has been imported into the United States by Defendant. Defendant has not offered the Juul2 for retail sale in the United States; Defendant's infringement through this product arises from its design, manufacture, use, and importation within the meaning of 35 U.S.C. § 271(a).

62. Defendant describes the Juul2 as featuring: (a) "A more consistent vapor experience"; (b) "A Bluetooth-enabled device with a larger, long-lasting battery and a 'smart light system' that communicates battery life and e-liquid level to the user"; (c) "An innovative heating element that improves product performance and temperature-control precision." Juul Labs, Juul2, www.juullabsscience.com/juul2/. *See also* Ex. B, Claim 1[d].

**E. The U.S. E-Cigarette Market**

63. The U.S. electronic cigarette market was valued at approximately $34.49 billion in 2024, with expected compound annual growth exceeding 13%. Grand View Research, E-Cigarette and Vape Market Size and Share Report, 2030; Technavio, E-Cigarette and Vape Market Size, Share, Growth, Trends, Industry Analysis Forecast 2027 (Oct. 2023). Market growth has been driven by the very features the '068 Patent introduced: customization options including temperature control and metered nicotine dosages.

64. At the height of its market dominance in approximately 2018, Defendant captured over 70% of the U.S. e-cigarette market. As of early 2024, Defendant held approximately 24% of U.S. e-cigarette market share, behind Vuse (R.J. Reynolds) at approximately 42%. *See* Winston-Salem Journal, *Vuse Retains Top E-Cigarette Market Share as NJOY Slowly Moves Up* (Feb. 2024).

65. The success of the Juul Devices is attributable to those products embodying the inventions described and claimed in the '068 Patent.

## VI. INFRINGEMENT OF THE '068 PATENT

**A. Claim 1**

66. Claim 1 of the '068 Patent recites:

A personal inhalation device comprising:

an outer shell having an orifice formed therein and containing a medium having one or more deliverables;

an atomizing unit disposed within said shell, whereby said atomizing unit heats air flowing thereon, and the heated air atomizes said medium creating a vapor

containing said deliverables when a user puffs on said orifice such that said vapor containing said deliverables is discharged through said orifice;

control electronics for controlling operation of said personal inhalation device, wherein said control electronics meter the deliverables discharged with said vapor;

an input device providing a user interface for selectively programming said control electronics to change at least one of a plurality of unique operating parameters of the personal inhalation device; and

an indicator light;

wherein said indicator light is an assembly comprising: a translucent base member mounted in one end of said outer shell, said base member having a socket formed therein, a translucent lens member having a body portion defining an outer surface, first connector extending from one end of said body portion, a second connector extending from another end of said body portion, said first connector being inserted into said socket, a tip member mounted on said second connector, and a light source mounted on said base member, said light source illuminating said outer surface of said body portion when activated; and

wherein the input device comprises at least one device selected from the group consisting of a pin configured to define at least one of the unique operating parameters, and a pressure transducer triggered by a sequence of activities selected from the group consisting of a plurality of inhalations, a plurality of exhalations, a combination thereof, a plurality of tappings on the personal inhalation device, and a plurality of tappings of the personal inhalation device against a surface, the

pressure transducer configured to define at least one of the unique operating parameters.

**B. Non-Limiting Element-by-Element Infringement Analysis**

67. Set forth below is a non-limiting description of the infringement of Claim 1 by the Accused Products. This description is based on physical teardowns, publicly available information, Defendant's own patent literature, and Defendant's public marketing materials. Plaintiff reserves the right to modify this description on the basis of information obtained during discovery. The claim chart attached as Exhibit B sets forth Plaintiff's non-limiting element-by-element infringement analysis for Claim 1 and for dependent Claims 3, 6, 7, 8, 9, 10, 11, 12, and 13, and is incorporated by reference as though fully set forth herein.

68. As to the preamble claim element, "a personal inhalation device": Each Juul Device is a personal inhalation device—a handheld, battery-powered device designed for personal use by a single user who inhales vapor through the mouthpiece. *See* Ex. B, Claim 1 (preamble).

69. As to the claim element "an outer shell having an orifice formed therein and containing a medium having one or more deliverables": Each Juul Device comprises an outer shell—an aluminum housing—having an orifice, the mouthpiece opening through which vapor is discharged. JUULpods inserted into the device body contain a proprietary nicotine salt liquid (the "medium") that includes nicotine (the "deliverable"). Defendant's own patent literature describes the device as "a housing that has a mouthpiece with an aerosol outlet" and "a liquid reservoir . . . disposed within the housing." U.S. RE Patent No. 49,114 at Abstract. *See* Ex. B, Claim 1[a].

70. As to the atomizing unit claim element: Each Juul Device contains an atomizing unit disposed within the shell. "The atomizer selectively generates an aerosol of the liquid in

response to suction pressure at the aerosol outlet." U.S. RE Patent No. 49,114 at Abstract. Imaging of the JUULpod shows the pod's internal structure, including the vaping-fluid reservoir and the atomizer assembly seated at the base of the pod, and photographs of a disassembled Juul2 pod show its atomizer components, including a mesh heating element through which air is drawn and the heater housing that surrounds it. *See* Ex. B, Claim 1[a], [b].

71. As to the claim element "control electronics for controlling operation of said personal inhalation device, wherein said control electronics meter the deliverables discharged with said vapor": Each Juul Device uses control electronics that meter the deliverables discharged with the vapor. Physical teardowns reveal a printed circuit board carrying a microcontroller, associated integrated circuits, passive components, and a pressure sensor. *See* Ex. B, Claim 1[c].

72. The control electronics meter the deliverables. Defendant's own patent literature describes circuitry "configured to vary a duty cycle of a signal at the output based on a draw profile and/or a vapor profile, the draw profile characterizing duty cycle and draw strength, the vapor profile characterizing duty cycle and vapor production." U.S. Patent No. 10,986,875 B2 at col. 2, ll. 62-66. The devices are "specifically designed to operate at temperatures below 300°C," with temperature regulation controlling the amount of nicotine delivered per puff regardless of the strength of the user's draw. *See* Ex. B, Claim 1[c].

73. Independent reviewers have confirmed the metering result: the temperature control "restrict[s] the vapor output to a minimum. It almost feels like you get this initial burst of power, you might get some light crackling, then it levels out right away. So, while the hits are consistent, they're consistently weaker than many of the devices out there." Kriegel,

*Juul Review: 6 Years Later*, Vaping360 (July 21, 2021). That is metering: the device controls what the user receives regardless of how they draw on it, exactly as the '068 Patent describes. *See* Ex. B, Claim 1[c].

74. As to the input device element: The Juul Devices include input devices that provide a user interface for selectively programming the control electronics. As described below, the JUULpod cartridges function as removable "pin" input devices, and the pressure sensor functions as a pressure transducer input device. Both satisfy this limitation. *See* Ex. B, Claim 1[d], [f].

75. As to the element "an indicator light": Each Juul Device contains an indicator light. The Juul 1 features a single multi-color LED visible on the body of the device. "The LED indicator lets you view the status of your JUUL Device's battery with a tap." Juul Labs, LED Indicator, https://www.juul.com/learn/device. The Juul2 features a "smart light system" with multiple LEDs. *See* Ex. B, Claim 1[e].

76. The indicator lights serve multiple functions beyond user inhalation detection: (a) indicating battery charge level (green >50%, yellow 25–50%, red <25% on the Juul 1); (b) activating during user inhalation; (c) communicating charging status; and (d) activating in user-triggered "party mode." This behavioral range mirrors the broad communication capabilities described in the '068 Patent's dependent claims. *See* Ex. B, Claim 1[e].

77. As to the indicator light assembly sub-elements: Physical teardown of the Juul 1 reveals that the indicator light is an assembly, not a bare LED exposed to the exterior. A translucent LED package carrying the LED die on a conductive leadframe is mounted on the circuit board within the shell, and an opening formed in that package is filled with translucent material. A translucent light-transmitting element is carried in an opaque black insert

holder above the package, with a portion of that element protruding from each side of the holder, and the LED's light is transmitted through it and projected out the opening in the outer shell. A person of ordinary skill in the art would recognize this configuration as a socketed light-pipe assembly—the same architecture described in the '068 Patent. *See* Ex. B, Claim 1[e]–[e.7].

78. The Juul 1's light assembly maps element for element onto the assembly recited in Claim 1. The translucent LED package (or "light box") mounted on the circuit board corresponds to the base member (element 52 in the '068 Patent); the package is seated on the daughter circuit board and constrained on its sides by an opaque black retainer. The opening formed in that package, in which translucent material resides, corresponds to the socket. The translucent light-transmitting element carried above the package corresponds to the lens member (element 54), and the portion of that element defining its outer surface is the body portion. The portion of that element protruding from the underside of the holder is the first connector, received within the socket in the base member, and the portion protruding from the opposite side is the second connector. The opaque black insert holder mounted on that second connector corresponds to the tip member (element 56)—which, being opaque, blocks light from exiting the end of the device, mirroring the '068 Patent's specification, which describes the tip member as made of opaque material for the identical purpose. The LED die mounted to the leadframe within the package is the light source (element 20). The light path is preserved: the LED die illuminates the base member, which functions as a light pipe transmitting light to the lens member, from which the light is projected through the opening in the outer shell, with the opaque tip member blocking light from exiting the end—exactly the architecture described in the specification. *See* Ex. B, Claim 1[e.1]–[e.7].

79. As to the element "a translucent lens member having a body portion defining an outer surface": The Juul 1's light path includes a translucent light-transmitting element, separate from and above the LED package, carried in the opaque black insert holder. That element permits the passage of light and has a body portion defining an outer surface through which the light is transmitted and made visible at the exterior of the device through the opening in the outer shell. *See* Ex. B, Claim 1[e.3].

80. As to the connector and tip member sub-elements: The portion of the lens member protruding from the underside of the insert holder is a first connector extending from one end of the body portion and received within the socket formed in the base member; the portion protruding from the opposite side is a second connector extending from the other end of the body portion; and the opaque black insert holder mounted on that second connector is a tip member. *See* Ex. B, Claim 1[e.4]–[e.6].

81. To the extent the structural details of the Juul Devices' indicator light assembly differ from the literal claim language of these sub-elements, the Juul Devices' light assembly infringes under the doctrine of equivalents.

82. Plaintiff reserves the right to supplement its infringement contentions, including with respect to the indicatorlight assembly, based on expert teardowns and discovery.

83. As to the element "a light source mounted on said base member, said light source illuminating said outer surface of said body portion when activated": Each Juul Device contains a light source—an LED die—mounted on the base member, specifically to the conductive leadframe within the LED package by means of a conductive metal pad. When activated, the LED die illuminates and its light is transmitted through the base member and

the lens member to the outer surface of the body portion, where it is visible to the user at the exterior of the device. *See* Ex. B, Claim 1[e.7].

84. As to the Markush group input device element: The Claim 1 input device limitation is written as a Markush group—a patent claim format listing a set of alternatives, any one of which satisfies the limitation. The Accused Products satisfy both alternatives. *See* Ex. B, Claim 1[f].

85. The JUULpod cartridges function as removable "pins" within the meaning of the '068 Patent. Each JUULpod has metal electrical contacts at its base that interface directly with corresponding contacts in the device body when inserted. The device's microcontroller measures the electrical resistance of the cartridge through these contacts to determine operating parameters, including coil temperature. *See* Ex. B, Claim 1[d], [f].

86. This is precisely the mechanism described in the '068 Patent: "[a] pin having a means (such as a resistive circuit or mechanical features similar to the teeth on a key) defining unique programming instructions" that are "provided to the logic circuit." '068 Patent at col. 7, ll. 1–9.

87. Juul's own patent confirms the identical mechanism. U.S. Patent No. 9,549,573 B2 (originally assigned to Pax Labs Inc., Monsees et al.) describes a "microcontroller" programmed through a "circuit with a resistor with at least one known resistance." Juul's European Patent EP 3,463,535 B1 (Bowen, Monsees et al., assigned to Juul Labs, Inc.) is even more explicit: it describes cartridge contacts as "pins or receptacles" (¶ 27), states that "[a]ny appropriate electrical contact may be used, including pins (e.g., pogo pins)" (¶ 28), describes "n pins or protrusions" on the cartridge that "can be detected by the vaporizer when the cartridge is inserted (e.g., by completing an electrical connection)" (¶ 39), and

discloses that the vaporizer detects "a characteristic resistance, inductance, or time response" through these contacts (¶ 40). Juul's own patent thus uses the word "pins" to describe the cartridge contacts at issue and describes the same resistance-based programming mechanism claimed in the '068 Patent.

88. The Juul2 pods contain electrical contacts that interface with the device body upon insertion, altering device operation depending on which pod is inserted through a resistive circuit—a direct implementation of cartridge-based programming. See '068 Patent at col. 8, ll. 7–25. *See also* Ex. B, Claim 1[d], [f].

89. The claim language uses "pin" broadly, and the JUULpod's electrical contacts function exactly as described—a removable component that makes a circuit connection with the logic circuit and provides programming instructions through a resistive circuit—regardless of whether the component also serves as a liquid reservoir. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

90. Each Juul Device contains a pressure sensor that detects user inhalation and activates the device. Beyond activation, the Juul Devices respond to sequences of user taps: to check battery life, a user taps the device to 'wake it up' and taps it twice gently, prompting the indicator light to report charge status. Juul Labs, https://www.juul.com/learn/device. *See* Ex. B, Claim 1[f].

91. These tapping sequences satisfy the Claim 1 limitation of "a pressure transducer triggered by a sequence of activities selected from the group consisting of . . . a plurality of tappings on the personal inhalation device." The '068 Patent expressly describes this: "the pressure transducer 38 could be triggered by sequentially tapping the inhalation device 10 against a

surface (or tapping on the inhalation device 10), whereby each tap would cause the reed switch 44 to close." '068 Patent at col. 7, ll. 25–29. *See* Ex. B, Claim 1[f].

92. Juul Devices have also employed a "party mode" feature, in which a user shakes or waves the device to activate a randomized pattern of light, corresponding to the '068 Patent's description of "a party mode in which the indicator light illuminates in different patterns." '068 Patent at col. 10, ll. 55–61. Even if Juul has deactivated certain features in later device iterations, the hardware—including the pressure sensor and associated test pads on the circuit board—remains present in the Accused Products as sold. The device as sold is capable of performing these functions.

## VII. JUUL'S KNOWLEDGE AND WILLFUL INFRINGEMENT

93. Juul has been aware of the '068 Patent and its underlying technology since at least 2018.

94. Juul's knowledge is confirmed by three of its own patents—U.S. Patent Nos. 10,117,465 (filed November 14, 2017), 10,117,466 (filed November 16, 2017), and 10,045,567 (filed November 16, 2017)—each filed more than three years after the '068 Patent issued. All three patents list both the '068 Patent and its published application in their References Cited sections.

95. Juul's actual knowledge of the '068 Patent is directly established by Juul's own conduct before the USPTO. In prosecuting the applications that issued as the patents identified above, Juul—through its prosecution counsel—itself disclosed the issued '068 Patent to the USPTO on its own Information Disclosure Statements ("IDS") filed in 2018. Juul therefore had actual knowledge of the '068 Patent and its claims no later than 2018.

96. Juul's knowledge of the '068 Patent is further evidenced by the fact that the '068 Patent describes the foundational architecture of the very product category in which Juul operates.

No company operating in the e-cigarette industry since 2014, let alone the market leader, could have been unaware of the ‘068 Patent.

97. Despite this knowledge, Juul continued to design, manufacture, import, sell and offer for sale products practicing the ‘068 Patent without obtaining a license or authorization from AJ Marketing.

98. Juul’s knowledge is further established through its corporate relationship with Altria Group, Inc. In December 2018, Altria acquired a 35% equity stake in Juul for approximately $12.8 billion and obtained board representation. During the period of Altria’s investment, Altria’s legal team was actively citing the ‘068 Patent in proceedings before the United States International Trade Commission and the Patent Trial and Appeal Board. Specifically, Altria Client Services LLC was a named real party in interest in IPR2020-01097, where the Cohen patent was used as a primary invalidity reference against a competitor’s e-cigarette patent. On information and belief, knowledge of the ‘068 Patent within Altria’s legal and patent teams was available to Juul through the companies’ shared governance and legal resources during the period of Altria’s investment.

99. Defendant’s willful disregard for the ‘068 Patent is further demonstrated by the fact that Defendant has itself used patents offensively to exclude competitors from the very market built on the architecture the ‘068 Patent describes. In June 2023, Defendant filed a complaint with the International Trade Commission asserting its own patents against NJOY (an Altria subsidiary). On January 29, 2025, the ITC issued a final determination finding NJOY’s products infringed Defendant’s patents and imposed a limited exclusion order and cease-and-desist orders. On information and belief, the patents Defendant asserted in that proceeding cover features of the pod-based vaporization architecture—

including programmable control electronics, cartridge-based programming, and indicator light systems—that are themselves dependent on or derivative of the foundational architecture first described in the '068 Patent. Defendant should not be permitted to wield patent rights built on Plaintiff's foundational technology to exclude competitors while refusing to license or compensate the inventor of that foundational technology.

100. In addition, AJ Marketing maintained a publicly accessible website at personalinhalationdevices.com, published on or about 2014 and remaining publicly accessible through approximately 2018, which described the '068 Patent as "the first patented programmable vaporization technology targeting the E Cig market," stated the patent was "awarded on October 7, 2014 following a 6 year application process," displayed patent figures and technical descriptions of the invention's architecture, and expressly solicited "strategic partners, end users and/or licensees to participate in the use and expansion of this newly patented technology." ***https://web.archive.org/web/20180805194704/http://personalinhalationdevices.com/.*** This website provided constructive notice of the '068 Patent to the e-cigarette industry for approximately four years—from 2014 through 2018—a period that encompasses the launch of the Juul 1 in 2015, the period during which Defendant captured over 70% of the U.S. e-cigarette market, and the period during which Defendant's patent prosecution counsel was citing the Cohen published application on IDS filings submitted to the USPTO. On information and belief, any competent prior art or freedom-to-operate search conducted by or on behalf of Defendant during this period would have identified this website and the '068 Patent it described.

101. On June 20, 2026, AJ Marketing, through its General Counsel, sent Juul written notice that the Accused Products infringe the '068 Patent. Juul received the letter on June 22, 2026, and acknowledged its receipt. The letter identified the '068 Patent, identified the Accused Products, described Juul's infringement, and enclosed a copy of the patent and a preliminary claim chart.

102. Since receiving that notice, Juul has not obtained a license to the '068 Patent, has not ceased or modified the conduct identified in the notice, and has continued to make, use, import, sell, and offer for sale the Accused Products.

103. The '068 Patent has never been practiced by AJ Marketing or any licensee. No product has ever been manufactured or sold under the '068 Patent, and no license has been granted to any third party that manufactures or sells a product practicing the patent. Because there is no patented article to mark, the patent marking statute, 35 U.S.C. § 287(a), does not limit or condition Plaintiff's recovery of damages. *See Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 395–96 (1936). AJ Marketing's damages are not limited to post-notice infringement; they extend to the full six-year statutory period under 35 U.S.C. § 286.

104. Defendant's infringement has been and continues to be willful, wanton, and deliberate. Defendant infringed with knowledge of the '068 Patent before AJ Marketing's June 2026 notice and has continued to infringe with knowledge of the '068 Patent, of the correspondence between the claims of the '068 Patent and the Accused Products, and of AJ Marketing's infringement position, after receiving that notice.

## VIII. COUNT I—INFRINGEMENT OF THE '068 PATENT (35 U.S.C. § 271)

105. Plaintiff incorporates by reference all preceding paragraphs.

106. The infringement alleged in this Count—direct, induced, and contributory—has been and continues to be willful, deliberate, and in knowing disregard of Plaintiff's rights, as set forth in Section VII above.

**A. Direct Infringement (35 U.S.C. § 271(a))**

107. Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '068 Patent, literally or under the doctrine of equivalents and without the permission, consent, authorization, or license of AJ Marketing. Each Accused Product practices every element of Claim 1, as set forth in the non-limiting claim chart attached as Exhibit B and in the non-limiting element-by-element analysis above.. The two products infringe through different acts. With respect to the Juul 1, Defendant makes, uses, sells, offers for sale, and imports the Juul 1 and associated JUULpods within the United States—including through www.juul.com, authorized retail distributors, convenience stores, and direct-to-consumer channels—pursuant to 35 U.S.C. § 271(a). With respect to the Juul2, which Defendant has not offered for retail sale in the United States, Defendant makes, uses, and imports the Juul2 within the United States in connection with product development, testing, demonstration, and regulatory activities, pursuant to 35 U.S.C. § 271(a). Defendant's directly infringing acts include acts performed by Defendant itself—described below—that have occurred within the six years preceding the filing of this Complaint and that continue to the present.

108. Defendant "makes" and "uses" the complete, assembled Juul 1 device within the meaning of 35 U.S.C. § 271(a) through Defendant's own conduct. Upon information and belief, Defendant designs and manufactures both components of the Juul 1 system—the device body and the JUULpod—each of which is useless without the other. Defendant itself

combines those components into the complete claimed apparatus: each time Defendant or its employees and agents insert a JUULpod into a device body and operate the assembled device—as Defendant does, on information and belief, in the quality-assurance, regulatory, demonstration, and development activities described below—Defendant makes and uses the patented invention within the United States. *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1361–63 (Fed. Cir. 2006) (affirming direct infringement of a two-component combination patent, notwithstanding that the components were sold separately, based on the defendant's own assembly of complete units, including units assembled to show distributors). On information and belief, Defendant has also sold, offered for sale, and distributed pre-assembled Juul 1 units—device bodies with JUULpods inserted—including demonstration, display, and sample units provided to distributors and retail partners. In addition, from 2015 through at least 2019 Defendant sold the two components together at retail as a complete unit, including in the bundled "Starter Kit" that contained the device body, a JUULpod, and a charging dock with assembly instructions. The Starter Kit and Defendant's assembly instructions are direct evidence that Defendant designed, built, tested, and demonstrated the device body and JUULpod as a single, unitary system.

109. On information and belief, Defendant's employees and agents use both the Juul 1 and the Juul2 within the United States for product testing, quality assurance, regulatory submissions, demonstration, and product development. Each such use necessarily involves the complete claimed combination: a Juul device cannot be tested, demonstrated, or operated without a pod inserted, so each act of testing, demonstration, or operation by Defendant is itself a making and using of the assembled, patented device. On information

and belief, Defendant's acts of this kind within the six years preceding this Complaint, continuing to the present, include: (a) quality-assurance and engineering-verification testing of assembled, operating devices; (b) scientific testing of assembled, operating devices in support of Defendant's Premarket Tobacco Product Applications to the U.S. Food and Drug Administration—including aerosol chemistry and constituent testing, stability testing, and human-factors, actual-use, and abuse-liability studies—conducted and relied upon from Defendant's 2020 PMTA submissions, through the FDA's marketing denial order proceedings and subsequent scientific review, to the FDA's July 2025 marketing authorization of the Juul 1 device and JUULpods, and continuing to the present; (c) demonstrations of assembled, operating devices to distributors, retail partners, investors, and regulators; and (d) research, development, and firmware testing of assembled, operating devices. These acts occurred and continue to occur within the United States and within the damages period of 35 U.S.C. § 286.

110. As a direct and proximate result, AJ Marketing has suffered and continues to suffer monetary damages in an amount to be proven at trial, but in no event less than a reasonable royalty.

**B. Induced Infringement (35 U.S.C. § 271(b))**

111. Defendant's customers directly infringe the '068 Patent when they use the Juul 1 as designed—by inserting a JUULpod and puffing on the mouthpiece, thereby assembling and operating the claimed personal inhalation device.

112. Defendant has induced and continues to induce its customers' direct infringement under 35 U.S.C. § 271(b).

113. Defendant conditions customers' use of the Juul 1 upon performance of the acts constituting infringement and establishes the manner and timing of that performance. A device body has no function without a JUULpod inserted, and a JUULpod has no function without a device body, so to obtain any benefit from the product a customer must assemble and operate the complete claimed system in the single manner Defendant's design dictates. By selling the device body and JUULpods as matched components of one system—and, from 2015 through at least 2019, as a bundled "Starter Kit" with assembly instructions—Defendant made the infringing combination the only way to use its product. The customer's insertion of the JUULpod is the final step in assembling the unitary system Defendant designed, manufactured, and distributed, and Defendant's instructions direct precisely that act. Customers do not receive the Juul 1 and act independently; they can avail themselves of Defendant's product only by performing the infringing assembly and operation Defendant directs. *Cf. Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (en banc).

114. Defendant actively instructs and encourages this infringing use. Defendant's website provides step-by-step instructions on pod insertion, inhalation, and tapping sequences, without which the device will not function; its product packaging includes written instructions and diagrams directing assembly and use; and it provides user guides, FAQ pages, troubleshooting resources, and customer support addressing the full range of device functionality. Defendant has also conducted extensive marketing campaigns encouraging consumers to purchase and use the Juul 1, and, on information and belief, its representatives engage directly with retail partners and consumers to demonstrate proper use. Because Defendant supplies written instructions with each unit that teach only the infringing

assembly and operation, it may be inferred that Defendant's customers follow those instructions and directly infringe. *See Golden Blount*, 438 F.3d at 1362–63 (citing *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986)).

115. Defendant has had knowledge of the '068 Patent since at least early 2018, when Defendant's prosecution counsel cited the Cohen published application and the issued '068 Patent in Information Disclosure Statements filed with the USPTO. In any event, Defendant has had such knowledge—of the '068 Patent, and of the fact that the acts it induces its customers to perform infringe the '068 Patent—since no later than June 22, 2026, when it received AJ Marketing's written notice letter identifying the '068 Patent and the Accused Products and describing Defendant's infringement.

116. Defendant's induced infringement has injured and continues to injure Plaintiff in an amount to be proven at trial, but in no event less than a reasonable royalty.

**C. Contributory Infringement (35 U.S.C. § 271(c))**

117. Defendant sells, offers for sale, and imports within the United States the Juul 1 Device bodies and JUULpod cartridges— which are material components of the system that infringes at least Claim 1 of the '068 Patent.

118. The Accused Products are not staple articles of commerce suitable for substantial non-infringing use. The function of the device bodies is to receive JUULpods and deliver nicotine through metered vapor. The function of JUULpods is to be inserted into device bodies for atomization. There is no substantial non-infringing use for either component.

119. Defendant knows, or is willfully blind to the fact, that the Accused Products are especially made or especially adapted for use in infringing the '068 Patent. Defendant has had knowledge of the '068 Patent since at least 2018, as alleged above. In any event, Defendant

has had such knowledge—of the ‘068 Patent and of the infringing use for which its components are especially made—since no later than June 22, 2026, when it received AJ Marketing's written notice letter identifying the ‘068 Patent and the Accused Products and describing Defendant's infringement.

120. Defendant's contributory infringement has injured and continues to injure Plaintiff in an amount to be proven at trial, but in no event less than a reasonable royalty.

## IX. DAMAGES

121. Plaintiff incorporates by reference all preceding paragraphs.

122. AJ Marketing has been damaged by Defendant's infringement. Plaintiff is entitled to damages adequate to compensate for the infringement, in no event less than a reasonable royalty, together with pre- and post-judgment interest and costs, pursuant to 35 U.S.C. § 284.

123. Pursuant to 35 U.S.C. § 286, Plaintiff seeks damages for infringement occurring within six years prior to filing. Laches is not a defense within this period. *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328 (2017).

124. Plaintiff is entitled to an ongoing royalty through the expiration of the ‘068 Patent, as extended by the 646-day Patent Term Adjustment.

125. Defendant's conduct warrants enhanced damages up to three times compensatory damages under 35 U.S.C. § 284 and attorneys' fees under 35 U.S.C. § 285.

## X. PRAYER FOR RELIEF

WHEREFORE, AJ Marketing, LLC respectfully requests:

(a) A judgment that Defendant has infringed and continues to infringe at least Claim 1 of the ‘068 Patent, pursuant to 35 U.S.C. § 271(a), through its making, using, selling,

offering for sale, and importing of the Juul 1, and through its making, using, and importing of the Juul2;

(b) A judgment that Defendant has induced infringement under 35 U.S.C. § 271(b);

(c) A judgment that Defendant has contributed to infringement under 35 U.S.C. § 271(c);

(d) A determination that Defendant's infringement has been willful;

(e) An award of damages no less than a reasonable royalty, pursuant to 35 U.S.C. § 284;

(f) An award of enhanced damages up to three times compensatory damages, pursuant to 35 U.S.C. § 284;

(g) A finding that this case is exceptional and an award of attorneys' fees, pursuant to 35 U.S.C. § 285;

(h) An accounting of all infringing sales and revenues;

(i) An ongoing royalty for Defendant's continued infringement after judgment, through the expiration of the '068 Patent;

(j) Pre-judgment and post-judgment interest and costs; and

(k) Such other and further relief as the Court deems just and proper.

## XI. DEMAND FOR JURY TRIAL

AJ Marketing, LLC hereby demands a trial by jury on all issues so triable.

Dated: September 3, 2026

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com

mfarnan@farnanlaw.com

Warren T. Burns*
Darren P. Nicholson*
**BURNS CHAREST LLP**
901 Main Street, Suite 5800
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com
dnicholson@burnscharest.com

Korey A. Nelson*
Amanda Klevorn*
Manfred Max Sternberg*
Claire Bosarge Curwick*
**BURNS CHAREST LLP**
201 Saint Charles Avenue, Suite 2900
New Orleans, LA 70170
Tel: (504) 799-2845
Fax: (504) 881-1765
knelson@burnscharest.com
aklevorn@burnscharest.com
msternberg@burnscharest.com
ccurwick@burnscharest.com

*Counsel for Plaintiff*

* Attorney admission via *Pro Hac Vice* applications to be submitted.